# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PARKER FREELAND, individually and on )
behalf of all others similarly situated,         )
                                                               )
               Plaintiffs,                       )
                                                               )
     v.                                               )     Civil Action No. 99-1002 (consolidated)
                                                               )
IRIDIUM WORLD COMMUNICATIONS, )
LTD., *et al*.,                                             )
                                                               )
             Defendants.                    )

## ORDER

Plaintiffs class, as holders of various securities of Iridium World Communications,

Ltd. (IWCL), sued Defendant Motorola, Inc. (Motorola), the lone-remaining defendant, for

securities fraud under Sections 10(b) and 20 of the Securities Act of 1934 and Section 15 of

the Securities Act of 1933, as well as SEC Rule 10b-5. The following motions are before the

Court: (1) Plaintiffs' Renewed Motion for Partial Summary Judgment under the Doctrine of

Collateral Estoppel [Doc. #203]; (2) Motorola's Motion for Summary Judgment on All

Claims [Doc. # 204]; (3) Motorola's Motion for Summary Judgment on Claims Directed

Against Motorola [Doc. # 205]; (4) Plaintiff Richard Mandelbaum's Motion for Partial

Summary Judgment on Section 15 Claim [Doc. # 207]; and (5) Motorola's Motion to

Exclude the Damages Testimony of Anthony Saunders [Doc. # 206]. The Court grants, in

part, and denies, in part, Motorola's Motion for Summary Judgment on All Claims. The

Court denies the remaining motions.

I.      **Facts**

Approximately twenty years ago, Motorola began developing a global wireless communications system called "Iridium" that would connect low-orbiting satellites, earthbound relay stations, and customer handsets, allowing customers to make and receive phone calls anywhere in the world, all with the convenience of one phone number and one bill.  The system was designed for customers who needed to make or receive phone calls in areas where cellular phones could not.  It was not, however, intended to be a replacement for cellular service; instead, Iridium expected its customers to use satellite services only where cell service was unavailable because the satellite-based system did not work well in urban areas and air-time charges were considerably more expensive.  Iridium was originally a subsidiary of Motorola but was later spun off into IWCL, Iridium Operating, and Iridium LLC.  Under this structure, IWCL was the vehicle for public investment in Iridium LLC, owning approximately 13% of that company by January 1999.  Iridium LLC was formed for the purpose of acquiring, owning and managing the Iridium system itself.  Motorola originally had the right to appoint five of the 28 members of the Iridium LLC Board of Directors until early 1999.  Both IWCL and Iridium LLC will be referred to collectively as "Iridium" throughout this Order.

The Iridium system as designed had four principal components: (1) the space segment that included 66 low-earth-orbit satellites and related control facilities; (2) ground stations or "gateways" that linked the satellites to terrestrial communications systems; (3) phones, pagers and SIM cards that provided mobile access to the satellite system and terrestrial

cellular systems; and (4) the land-based wireless roaming infrastructure that facilitated roaming among the land-based cellular systems and the Iridium system. The gateways were twelve earth stations which provided the call-processing services by connecting calls made through the Iridium system to and from local land lines through an international switching center. Many of Iridium's gateway owners–separate companies controlling gateways in specific geographic regions–were strategic investors in IWCL.

Dr. Edward F. Staiano was Vice-Chairman and Chief Executive Officer of Iridium LLC and Iridium Operating, as well as CEO of IWCL, from before September 8, 1998, until April 22, 1999. Prior to his position at Iridium, he was employed at Motorola for 23 years, where he was part of senior management, holding a position he described as one "of the three operating vice presidents of the corporation" reporting directly to the CEO. Roy T. Grant was Chief Financial Officer and a vice president of Iridium LLC and IWCL until March 29, 1999.

There were contracts between Motorola and Iridium, wherein Motorola assumed responsibility for designing, building and launching the satellite communications system and developing the handset technology. As a result, Motorola was a contract creditor of Iridium. Beginning in 1996, Motorola agreed to guarantee the unsecured portion of Iridium's credit facility up to $750 million. In late 1997, Motorola agreed to allow its guarantee exposure to increase to more than $1 billion. As part of its terms, however, it gained the right to appoint a sixth director on the Iridium LLC board once the guaranteed borrowing by Iridium exceeded $750 million. By March 1999, Motorola designated six of the 29 directors as a

result of this agreement. As part of the guaranty's terms, Iridium could not take certain actions without Motorola's consent, including acquisitions and recapitalizations, additional borrowing, and payment of dividends except as expressly authorized. Motorola contends that these terms in connection with guarantees were common, but Plaintiffs assert there is no precedent in which a guarantor receives the right to appoint an additional director.

On November 1, 1998, Iridium launched "full" commercial service, over a month after its originally scheduled September launch. Iridium delayed the commercial launch in an effort to "refine system performance and quality" and "improve operational stability of the network." On December 23, 1998, Iridium closed on "new bank credit facilities providing for an aggregate amount of up to approximately $1.55 billion of borrowings." This included a senior secured credit facility for $800 million. As part of this secured bank facility, Iridium newly covenanted that it would satisfy certain minimum revenue and subscriber levels, including:

(a)    by March 31, 1999, it would have at least 27,000 Iridium World Satellite Service subscribers and at least 52,000 total subscribers;

(b)    by ten business days after March 31, 1999, it would have cumulative cash revenues of at least $4 million and cumulative accrued revenues of at least $30 million;

(c)    by June 30, 1999, it would have at least 88,000 Iridium World Satellite Service subscribers and at least 213,000 total subscribers;

(d)    by July 15, 1999, it would have cumulative cash revenues of at least $50

4

million and cumulative accrued revenues of at least $150 million;

(e)     by September 30, 1999, it would have at least 173,000 Iridium World Satellite

Service subscribers and at least 454,000 total subscribers; and

(f)     by October 14, 1999, it would have cumulative cash revenues of at least $220

million and cumulative accrued revenues of at least $470 million.

Between September 8, 1998 and May 13, 1999 (the class period), Iridium and

Motorola made a number of statements regarding the status of the Iridium service and

technology, as well as their expectations about the market and the number of customers they

would attract.  These statements include press releases issued by Iridium and Motorola; an

SEC registration statement filed on October 13, 1998, by IWCL, made in connection with

a planned secondary offering (an amended registration statement was filed November 13);

a January 21, 1999, prospectus by IWCL; as well as statements reported by various third-

party publishers, such as newspapers and analysts.  Many of these statements related to

whether Iridium would be able to satisfy the bank covenants regarding minimum number of

subscribers and revenues.  Iridium and Motorola's statements were often positive, suggesting

that they expected to meet the bank covenants, although many of the statements carried

cautionary language indicating that these were based on certain assumptions.  Plaintiffs

contend that internal records and memoranda reveal that at the time these statements were

made, both Iridium and Motorola knew that it would actually be almost impossible for

Iridium to meet the required covenants.  Motorola disputes this and responds that, in any

event, the cautionary language, or "forward-looking statements," make their knowledge of

whether Iridium would meet the bank covenants irrelevant.

On February 19, 1999, analysts and news sources started reporting that Iridium would not be able to satisfy the bank covenants and that Iridium would not project where it would be at the end of the quarter.  On March 1, 1999, Iridium issued a press release stating that "with current projections showing that initial delays with Iridium's global service roll-out will likely cause the company to fall short of the first quarter target numbers, we do expect that we will be working with our banks to modify these milestones going forward."  On March 29, 1999, Iridium issued another press release stating that it had "received a 60-day waiver from its lenders" of "the financial covenants relating to customers and revenues" and that Iridium had "notified its bank lenders that it is in the process of revising its revenue and customer estimates" and that "it intends to request a modification of the minimum revenue and customer level covenants in the secured bank facility once this revision is complete."  On May 13, 1999, Iridium issued a press release stating that it would not satisfy its covenants and had hired counsel to provide restructuring advice.

Plaintiffs maintain that Iridium and Motorola knew well before February 19, 1999, that the Iridium system did not function up to commercial expectations and that Iridium was not going to meet the customer and revenue requirements established by the bank covenants. Plaintiffs present evidence that Alpha testing did not involve  performance in real world user environments.  Beta testing began even before the Alpha trials ended and was shortened from seven weeks to five.  While in public, Iridium and Motorola continued to claim that call connection rates and call quality were improving, and that dropped call rates were falling,

Plaintiffs contend that those tests were conducted in a "rigorously controlled" environment, while other data showed that the system performed dramatically poorer under "real world" condition tests.

For example, Motorola claims that call setup success rates rose from just over 40% as of September 25, 1998, to 80% as of October 23, 1998; KPI ("key performance indicator") testing showed that call establishment rose from 10% on September 16, 1998, to 72% as of October 27, 1998; and dropped call rates declined from 50% to 28% in that same timeframe. Motorola's testing at its Chandler, Arizona, plant showed even better improvements: 90% call establishment and only 15% dropped calls on October 27, 1998.  Results for the first week of commercial operations (November 1-7, 1998) showed an average call establishment rate of 85%, a dropped call rate of 13% and a good voice quality rate of 89%.  From January 15 to 18, 1999, the average call establishment rate was 94%, the dropped call rate was 5% and the good voice quality rate was 91%.  Motorola contends that even though its service was improving throughout this time, it tempered this optimism with forward-looking statements.

Plaintiffs dispute these tests, citing much evidence that the system did not perform that well in reality, including testimony that KPI tests reflect "controlled circumstances which typically don't obtain in the real world."  They cite the fact that the KPI tests made just before and after commercial activation used phones mounted on racks at the gateway locations, and that their antennas were disconnected, instead  hooked up to cable connected to a mast located on rooftops.  Further, Plaintiffs cite evidence that on October 27, 1998,

Alpha testers established only 54% of their calls.   An internal report stated that "[p]erformance in the hands of trial coordinators gave call success rate less than 70%, drop rates above 35% until Dec. '98."   Additionally, a monthly review in April 1999 showed actual call date records from subscribers indicating only an 83% establishment rate and 20% drop rate.   Voice quality was also questionable, depending highly on the user's location and sometimes being described as "slurred, drunken-sounding."   Anecdotal testimony also reveals customers, including the wife of an Iridium executive and NATO personnel, had extensive trouble with the system in real world conditions.   Plaintiffs cite a number of internal documents and testimony that call establishment rates were lower than the reported ideal condition numbers reported by Motorola and Iridium.

The parties also dispute whether Iridium and Motorola accurately stated the number of handsets that would (or could) be produced.  From the outset, there appears to have been problems with the Kyocera handsets, but by late October 1998, Iridium released a statement that substantial progress had been made by Kyocera and that it expected 4,800 satellite-only and 9,400 multi-mode handsets to be available in November.   Iridium also stated on November 1, 1998, that Motorola and Kyocera together would produce a total of 100,000 phones by the end of that year.   Motorola contends that by December 17, 1998, it had shipped 23,000 handset units and its production levels were at 1,000 handsets a day.  By the end of 1998, Motorola had produced and shipped over 35,000 handset units and was shipping at a rate of 1,000 units a day.

Plaintiffs respond that by November 29, 1998, only 6,200 commercial handsets had

been shipped by Motorola; that by December 7, 1998, 14,381 commercial units were manufactured and 11,158 were shipped; and that in early December, production levels reached approximately 1,000 units per day. Plaintiffs cite testimony, though, that the production level did not "stay at that level for very long because we were producing beyond what we had orders for fairly quickly after we achieved that level." Plaintiffs also refer to a December 17, 1998, internal memorandum circulated among Motorola executives that stated: "Production levels have reached 1,000 per day, 23,000 units have shipped, 11,000 are still with Brightpoint, and 12,000 units have gone on to the gateways, or service providers. There is suspicion that only 1,000 are in actual service." An internal Motorola memo dated June 29, 1999, stated that "prior to January 1, 1999, we had delivered 29,000 portable phones."

Finally, both sides dispute the number of Iridium subscribers and revenue projections. On October 22, 1998, it was reported to Iridium's board of directors that there were 10,000 reservations and that Iridium had over 97,000 qualified leads (defined as potential subscribers "who thoroughly understand the product and price and request a follow-up call"). Iridium's "Target Plan" projections for subscribers and revenue for the first quarter of 1999 were 151,000 satellite subscribers, $56 million in cumulative accrued revenue and $9 million in cumulative cash revenue. The gateway forecasts for the first quarter were 54,000 satellite subscribers, $4 million in cumulative cash revenue and $23 million in cumulative accrued revenue. Iridium managers and directors, however, believed that the gateway forecasts were inconsistent with Iridium's own forecasts and did not take into account important programs

designed to help Iridium meet its Target Plan.  Motorola maintains that Iridium and Motorola

management believed that Iridium would meet its first quarter 1999 bank covenants.

Plaintiffs argue that, in reality, Iridium was not attracting the number of customers

necessary to meet its obligations under the bank covenants.  For example, by January 14,

1999, Motorola estimated there were between 4,000 and 8,000 actual subscribers.  An

internal memo dated January 22, 1999, states there were 3,393 paying subscribers by January

20, 1999.  Another memo dated February 16, 1999, distributed among Motorola executives,

stated there were 6,272 subscribers as of February 15, 1999.  On March 2, 1999, Staiano, in

a presentation to the Iridium board of directors, explained that as of February 26, 1999, there

were only 6,400 subscribers, and admitted that cumulative revenue was falling short of the

March 31, 1999, targets and covenants.

Iridium ultimately failed to meet its covenants.  Internal memos show that by the

summer of 1999, Iridium admitted that "[t]he decision to begin commercial service without

sufficient beta testing was driven by financial and not marketing urgency" and that "[t]he

premature launch was a mistake."  The failure of Iridium to adequately test its system

"damaged Iridium's credibility in the marketplace and poisoned relations with several key

service partners who felt that they were given a poorly functioning service for sale in a highly

discriminating market."  Thus, Plaintiffs have provided evidence that even Iridium believed

that the system did not, at the very least, live up to its customers' expectations.

## II.     Discussion

### A.     Summary Judgment Standard

10

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).  "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 250).

When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, drawing "all reasonable inferences in favor of the nonmoving party."  *Id*.  But, to establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248.

### B.    Plaintiffs' Partial Summary Judgment Based on Collateral Estoppel

For the third time, Plaintiffs request that Motorola be precluded from challenging certain facts based on collateral estoppel.  The facts Plaintiffs wish to preclude Motorola

11

from relitigating were found in *Chase Manhattan Bank v. Motorola, Inc.*, 184 F. Supp. 2d

384 (S.D.N.Y. 2002), and include:

1.  "The projections of the Iridium Gateway companies showed clearly that Iridium inevitably would be in Default under the Credit Agreement."  *Id*. at 390, ¶ 33(a).

2.  "Iridium had no basis as of the date it issued the Certificate to believe that it would achieve Cumulative Adjusted Accrued Revenues by February 28, 1999 of $25 million, or that it would be able to satisfy the Financial Covenants as of March 31, 1999."  *Id*., ¶ 31.

3.  "Although Iridium proposed a 'Gateway Rev-Up Project' to boost sales and the Gateways' projections, Iridium knew that actual revenue and subscriber results as of February 10, 1999 were far below the targets provided by the Credit Agreement and that the Rev-Up Project could not make up for the deficiency in time."  *Id*., ¶ 33 (b).

4.  "When Iridium issued its Certificate on February 11, 1999, it had only 17 days before it was required to achieve, as of February 28, 1999[], Cumulative Adjusted Revenues of $25 million.  As previously discussed, Iridium knew, at the time of its Certificate, that it could not achieve those revenues.  Similarly, at the time it issued the Certificate, Iridium knew that it could not achieve the March 31, 1999 Financial Covenants."  *Id*. at 392-93, ¶ 40 (citations to record omitted).

5.  "[A]t the time it issued the Certificate [on February 11, 1999], Iridium knew that it had not maintained, and could not maintain, the Iridium System consistent with the Financial Projections set for March 31, 1999."  *Id*. at 393, ¶ 41.

6.  "Iridium failed to generate sufficient revenue to satisfy either the Financial Targets set for February 28, 1999[] or the Financial Covenants set for March 31, 1999."  *Id*., ¶ 43.

7.  "Iridium launched its commercial service on November 1, 1998, before all components of the system had been proved and before it was ready for full commercial launch."  *Id*. at 386, ¶ 6.

8.  "The lack of roaming partners rendered the land-based roaming infrastructure

of the Iridium System ineffectual." *Id*. at 391, ¶ 36(b).

9.      "[As of February 10, 1999,] Iridium had not yet entered into 'Roaming Partner' agreements with cellular network operators in 18 of the 27 key markets that accounted for 80% of Iridium's business plan, and the existing roaming partners largely had not launched Iridium service and were not ready to serve Iridium customers on their local networks." *Id*. at 392, ¶ 38 (citations to record omitted).

10.     "Equipment problems continued.  In particular, [Kyocera] handsets, one of the two handsets for use with the Iridium system, continued to be unavailable due to quality problems that the company could not solve.  Without handsets in adequate number, the provisions of the Credit Agreement could not be satisfied." *Id*. at 390, ¶33(c) (citations to record omitted).

11.     "Distribution problems continued.   In particular, Iridium's distribution channels were not adequate to supply Motorola handsets to projected subscribers at a sufficient rate." *Id*., ¶ 33(d).

12.     "Iridium could not distribute enough Iridium handsets by March 31, 1999 to the projected number of voice subscribers." *Id*. at 391, ¶ 36(a).

13.     "Iridium was unable to supply enough handsets to achieve 355,400 voice subscribers by March 31, 1999, the number of voice subscribers provided by the Financial Projections.  To access the Iridium System, subscribers needed handsets capable of sending and receiving signals from the Iridium satellite constellation.  These handsets were to be manufactured by either the Kyocera Corporation ("Kyocera") or Motorola.  As of February 10, Kyocera was unable to manufacture handsets of satisfactory quality, and Motorola had manufactured and shipped at most 38,000 handsets, far less than needed by March 31.  Motorola's production capacity for Iridium handsets was between 26,000 and 30,000 per month or between 750 and 1,000 per day, and in the 50 days between February 10 and March 31, 1999, Motorola could not have manufactured and shipped enough handsets to satisfy the projected subscribers.  Iridium therefore had no reasonable basis to certify on February 10 that the Iridium System was being maintained in a manner consistent with achieving the Financial Projections." *Id*. at 391-92, ¶ 37 (citations to record omitted).

14.     "Kyocera handsets were qualitatively deficient and therefore were not available and it was unknown when they would be available; Motorola could

not manufacture enough cellular cassettes in time." *Id*. at 392, ¶ 39.

Motorola makes several objections: (1) the issues are not the same because *Chase* was a breach of contract case, while the current case involves securities fraud; (2) the *Chase* findings were either not litigated or not necessary to that court's ultimate ruling; (3) preclusion would be unfair to Motorola because those issues would not dispositively resolve any of the matters the jury in this case must address, and would only confuse the jury; (4) another court, in In re *Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007), found facts contrary to *Chase*; (5) Motorola, again, would be prejudiced because discovery has been completed based on the understanding that preclusion would not apply.

Under offensive collateral estoppel, "a defendant is precluded from relitigating identical issues that the defendant litigated and lost against another plaintiff." *Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984). "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984). Application of this doctrine is within the Court's discretion. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). Collateral estoppel is appropriate only if: (1) the issue was actually litigated in the previous case; (2) the issue was actually and necessarily decided in that case; and (3) preclusion would not lead to unfairness. *See Jack Faucett*, 744 F.2d at 125.

Motorola contends that "every single one" of the facts involve "Financial Projections" or "Financial Targets" that were much higher than the bank covenant requirements. The

Court recognizes that many of the facts found by the *Chase* court not only included Financial Projections and Financial Targets (which are not at issue in this case), but also references the financial covenants.  However, the Court agrees that separating the findings to exclude the projections and targets would likely confuse the jurors, especially if they do not know what those projections and targets were.  And introducing evidence about the targets and projections, which are not at issue here, would likely only create more, not less, confusion.  Thus, there is a certain degree of unfairness in estopping Motorola on these issues.

Further, the bankruptcy court's findings in In re *Iridium Operating LLC* also present a question of fairness.  *See Parklane Hosiery*, 439 U.S. at 330 ("Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.").  In that case, decided August 21, 2007, unsecured creditors of Iridium sought to recover against Motorola on behalf of the Iridium estate. The *Iridium* order focuses primarily on whether Iridium was insolvent or had unreasonably small capital during the relevant period.  *See Iridium*, 373 B.R. at 290-91.  Although ultimately addressing a different legal issue than involved in this case, the *Iridium* court explained:

> The questions of solvency and capital adequacy necessary have entailed a comprehensive review of the engineering origins of the Iridium project, the physics of radio frequency and fading, the technical characteristics and limitations of the Iridium system, what was known concerning these characteristics and limitations, the nature and extent of the reasonableness of Iridium's business plan, and the significance to the valuation question of various capital markets transactions that took place during the relative period.

15

*Id.* at 292.  Thus, the *Iridium* court necessarily reviewed many of the same facts in *Chase*, as well as this case, and ultimately came to a different conclusion, finding for Motorola.  *See, e.g., id.* at 299 ("Mr. Mondale indicated that he might have elected to pursue a modified marketing strategy if he knew in advance precisely how the system would function once activated, but such an acknowledgment does not mean that the marketing strategy adopted by Iridium was anything but reasonable.").  Because of this, the Court believes it would be unfair to estopp Motorola based on one case, while another, later case made more favorable findings.

Finally, it is somewhat unfair, at this late stage of the litigation, to spring collateral estoppel on Motorola.  The *Chase* decision is from 2002, and the Court has twice refused to preclude Motorola from relitigating those issues.  Motorola conducted its discovery and prepared its summary judgment motions based on the understanding that it was not collaterally estopped.  Thus, the Court, in its discretion, denies Plaintiffs' motion for summary judgment based on the collateral estoppel doctrine.

## C.   Motorola's Summary Judgment on All Claims

### 1.    *Forward Looking Statements.*

Motorola contends that even if the statements in various press releases and in the January 21, 1999, prospectus were false at the time they were made, they were "forward-looking statements" and accompanied by appropriate disclaimers, rendering any knowingly false statements immaterial.  This argument is based on 15 U.S.C. § 78u-5(c)(1)(A)(I), the PSLRA safe harbor, which reads, in part:

> [I]n any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

Under Motorola's interpretation of the safe harbor, the statute's use of the disjunctive "or" between subsections (A)(I), (A)(ii) and (B)(I) means that "actual knowledge" of a statement's falsity is immaterial as long as that statement is identified as "forward looking."

Motorola raised this same argument in its motion to dismiss, which the Court denied in its August 31, 2004, Order [Doc. # 95].  The Court noted:

> Such vaguely pessimistic generalities, however, do not shield the defendants from liability for specific statements which were blatantly false.  No degree of cautionary language will innoculate statements that defendants knew were simply not true when made, *see Milman v. Box Hill Systems Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999), and "not every mixture with the true will neutralize the deceptive," *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991).  In this case, the plaintiffs' allegations would amount to very strong proof that the defendants knew their statements were false and misleading.  The statement that the company believed it would meet subscriber and revenue goals, for instance, was contradicted by internal memoranda indicating the goals were outrageous and unattainable.  Furthermore, many of the statements which defendants represent as contingent but unanticipated future adversities are not so because they had already come to pass.  For example, the Prospectuses speak of contingent risks, stating that delays could occur, resulting in lost revenue and inability to repay debt if "significant errors in the design and implementation of the Iridium system are discovered during commercial operations [or] significant improvements in service quality are needed . . . to generate the demand Iridium expects."  At the time these statements were made, the design errors had become realities, apparent to all insiders.

Slip Op. at 12.  Motorola argues that the cases relied on by the Court involved the "bespeaks caution" doctrine and not the statutory safe harbor; however, not only has Motorola also raised that doctrine as a defense, it is clear from the Court's language that its analysis was aimed directly at the safe harbor, as well as the court-created bespeaks caution doctrine.

Despite the Court's earlier ruling, Motorola, in rearguing this point, suggests since that ruling, a majority of circuits have held that "intent" does not play a role in the analysis under Section 78u-5(c)(1)(A)(I).  It is true that some courts, including another court in this district, have noted that "courts have held that once the first clause of the [safe harbor] provision is satisfied, 'the defendants' state of mind is not relevant.'"  In re *XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 186 n.14 (D.D.C. 2007) (citing *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 674 (6th Cir. 2003); *Kurtzman v. Compaq Computer Corp.* No. 99-779, 2000 WL 34292632, at *6 n.15 (S.D. Tex. Dec. 12, 2000)).  However, neither the D.C. Circuit nor the United States Supreme Court have directly ruled on the issue.

For their part, Plaintiffs request that the Court, having already ruled on the issue in its motion to dismiss order, should apply the law of the case doctrine.  "Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to a final judgment."  *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (citing *Schoen v. Wash. Post*, 246 F.2d 670, 673 (D.C. Cir. 1957)).  Still, consistency in the law is generally desirable.  In this case, the Court does not believe that the safe-harbor provision necessarily protects statements that were knowingly false at the time they were made.

At least one commentator has suggested that a proper interpretation of the safe harbor

18

provision should satisfy three criteria: "(1) each provision should protect some set of forward-looking statements that the other two provisions does not (in other words, none of the three provisions should be rendered superfluous by the other two); (2) the provisions should provide acceptable guidance to managers; and (3) the interpretations ought to be reasonable constructions of the statutory language." Hugh C. Beck, The Substantive Limits of Liability for Inaccurate Predictions, 44 Am. Bus. L.J. 161, 199 (2007). The Court agrees that this approach is both reasonable and incorporates proper statutory interpretation requirements. Under this approach, cautionary language attached to forward-looking statements cannot innoculate *all* knowingly false or misleading information:

> Satisfying in part of the first criterion, the [In re *Donald J. Trump Casino Securities Litigation*, 7 F.3d 357 (3d Cir. 1993)[1]]-based framework would give the "meaningful cautionary statements" provision significance in relation to the "actual knowledge" provision because even a projection management actually knew was baseless would be protected so long as it was accompanied by disclosures tailored to the subject matter of the projection. The guidance implicit in these interpretations, however, fails to meet the second criterion; whenever the interests of managers favored publishing misleading disclosures, they could print baseless projections without fear of liability so long as they could create content for accompanying statements tied into the subject matter of the projection. For the same reason, this materiality-driven framework also fails the third criterion; a reasonable interpretation of "meaningful cautionary statements" would not include statements that disclose risks tailored to a

---

[1]The *Trump* case, decided in 1993 prior the PSLRA's 1995 enactment, involves the bespeaks caution doctrine. However, it is undeniable that that doctrine and the PSLRA's safe harbor are intertwined. In *Trump*, the Third Circuit held that in order to survive a motion to dismiss under the bespeaks caution doctrine, the complaint must allege that the defendants made a *material* misrepresentation. *See* 7 F.3d at 369. According to the *Trump* court, under the doctrine, in order to find knowingly false or misleading statement immaterial, "the cautionary statements [forward-looking statements] must be substantive and tailored to the specific future projections, estimates or opinions . . . ." *Id*. at 371-72. Thus, *Trump* essentially articulates Motorola's arguments regarding the safe harbor, albeit under the court-created doctrine.

forward-looking statement yet fail to disclose contingencies management knows are more likely to cause a departure from projected results.

*Id*. at 200.

Motorola's argument focuses on the *materiality* of the statements. Instead, the focus should include whether cautionary statement is *meaningful*. "Under this interpretation, to demonstrate that a prediction falls outside the protection of the meaningful cautionary statements safe harbor provision a plaintiff must show that a reasonable investor would have drawn important incorrect inferences from the publication of the prediction despite disclosures in the accompanying statements." Beck, *supra*, at 200. Thus, "[i]f evidence adduced by a plaintiff demonstrates management's belief that a prediction was misleading but fails to show that a reasonable investor would have drawn an important incorrect inference from the prediction's publication, the first safe harbor provision, under this interpretation, would immunize the statement even though the third would not." *Id.* at 203. This also avoids the "incentive to lie" approach of the *Trump*-based interpretation:

> [I]n most cases where evidence adduced [including indirect evidence of scienter] demonstrates management's "actual knowledge" that a prediction was false, the same evidence will also demonstrate that statements accompanying the prediction were not "meaningful" because they failed to prevent important incorrect inferences a reasonable investor would have drawn about the probability of a departure of actual results from the predicted outcome. Accordingly, as managers perpetrating a fraud through the use of baseless predictions leave a trail of "actual knowledge" evidence they will generally be unable to avoid creating evidence of the "meaninglessness" of the statements accompanying the predictions at the same time.

*Id*. at 204. Moreover, this interpretation is consistent with the Supreme Court's decision in *Virginia Bankshares*, which this Court cited for support in its August 31, 2004, Order. *See*

20

Beck, *supra*, at 202-03.

In the present case, Plaintiffs have offered evidence that Iridium and Motorola knew their statements to be false or misleading at the time they were made, or, at the very least, would allow a trier of fact to infer such.  Further, as the In re *Iridium* court explained, "[T]he markets, especially after commercial launch, were reasonably well informed as to Iridium's operating characteristics and constraints, yet still managed to be terribly wrong about the company's actual prospects."  373 B.R. at 293.  Without adopting the bankruptcy court's actual findings, perhaps one of the reasons (that can be inferred from Plaintiffs' evidence) that the markets were wrong is that  reasonable investors were drawing incorrect inferences from the cautionary statements. Thus, there remain genuine issues of material fact as to whether Iridium and Motorola provided *meaningful* cautionary statements under Section 78u-5(c)(1)(A), and Motorola cannot prevail at the summary judgment stage that its statements fall within the PSLRA's safe harbor.  *See, e.g.,* In re *Nash Finch Co.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("[C]autionary language cannot be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false." (citing In re *SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003)).

For these same reasons, the Court declines to grant Motorola summary judgment under the bespeaks caution doctrine.  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Accordingly, projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a

reasonable basis when made." (citing *Trump*, 7 F.3d at 371)).

2.      *Third-Party Publications.*

Next, Motorola argues that it cannot be held liable for statements made by third parties in newspaper and magazine articles.  Specifically, Motorola states it is not liable for quotes or paraphrased statements made by either it or Iridium, citing for support *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993).  The Second Circuit has held that "(w)hile a company may choose to correct a misstatement in the press not attributable to it, . . . we find nothing in the securities legislation requiring it to do so."  *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 162 (2d Cir. 1980) (quoting *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 949 (2d Cir. 1969)).  But, in this case Plaintiffs' allegations are that Iridium and Motorola made fraudulent statements to the press and analysts, which were then reprinted, often verbatim.  The question is whether Motorola can be held liable in these situations.

Plaintiffs argue that *Raab* establishes a "minority" "control" test and instead argue for the Second Circuit's "majority" "entanglement" test as explained in *Elkind*.  The Court doubts there is much of a difference as *Raab* cites *Elkind* for support.  *See Raab*, 4 F.3d at 289. "Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysis or third parties unless they have 'sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions "attributable to [the issuers]."'"  In re *Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002) (quoting *Elkind*, 635 F.2d at 163).  The Eighth Circuit explains:

In order to attribute third-party statements to the defendants, the investors must

22

> demonstrate that the statements were adopted by defendants or attributable to the defendants in some way, such as when officials of a company "have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views." The investors could also allege that the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market.

*Id.* (citing *Elkind*, 635 F.2d at 163, and *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)).

The Second Circuit has held similarly: "Under the law of this circuit, plaintiffs may state a claim against corporate officials for false and misleading information disseminated through analysts' reports by alleging that the officials either: (1) 'intentionally foster[ed] a mistaken belief concerning a material fact' that was incorporated into reports; or (2) adopted or placed their 'imprimatur' on the reports." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (citing *Elkind*, 635 F.2d at 163-64); *see also* In re *Cabletron Sys. Inc.*, 311 F.3d 11, 37-38 (1st Cir. 2002) (adopting *Elkind*'s entanglement test); In re *Revlon, Inc. Sec. Litig.*, No. 99-10192, 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001). Further, "defendants may be liable for misrepresentations of existing facts . . . ." *Novak*, 216 F.3d at 315.

Motorola argues that it cannot be held liable if it did not actually "control" the third parties because its quotes may be taken out of context or inaccurately interpreted. *See* In re *Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1171 (D.D.C. 1996). The Court recognizes that *Newbridge Networks* might suggest that plaintiffs must allege defendants had a certain amount of control over the final report or news article. *See Newbridge Networks*, 926 F. Supp. at 1171 ("*It is not sufficient to allege that defendants provided analysts with the information on which the analysts' reports were based.* Plaintiffs must also allege that

defendants had some measure of control over the content of the final report or projection issued by the analysts." (quoting In re *Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1237 (N.D. Cal. 1994))).  But *Newbridge Networks* was decided shortly after passage of the PSLRA; the Court believes that the Second Circuit's *Novak* and the Eighth Circuit's *Navarre* opinions provide the current state of the law.  Both *Novak* and *Navarre* explain that plaintiffs may establish liability in ways other than showing the third-party reports were endorsed by defendants.  *Compare Novak*, 216 F.3d at 314 (holding that plaintiff may state claim for fraud for information disseminated to analysts by alleging officers "'intentionally foster[ed] a mistaken belief concerning a material fact' that was incorporated into reports"), *with Newbridge Networks*, 926 F. Supp. at 1171 ("Courts have made clear that the way to determine whether or not defendants should be held liable for such statements is by first determining whether the analysts' reports were endorsed by defendants.").  As noted by the First Circuit, "[a] test that required 'control' would give company officials too much leeway to commit fraud on the market by using analysts as their mouthpieces.  *Elkind* and its progeny set a better boundary." *Cabletron*, 311 F.3d at 38.  This Court agrees.

In this case, Plaintiffs have supplied evidence from which it may be inferred that Motorola used third parties as conduits, making false and misleading statements with the intent that the third parties communicate those statements to the market.  Plaintiffs, through their references to internal memoranda and deposition testimony, have cited evidence in the record from which it can be inferred that Iridium and Motorola intentionally fostered a mistaken belief about material facts which was incorporated into newspaper articles and

analyst reports.  *Cf. Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001) ("Evidence we have found relevant to the scienter issue includes: . . . a divergence between internal reports and public statements . . . .").  Much of the evidence is direct quotes from Iridium or Motorola repeated by third parties.  Thus, Plaintiffs have properly alleged entanglement by Motorola and Iridium.  *See Cabletron*, 311 F.3d at 38 ("Entanglement also includes situations where company officials 'intentionally foster a mistaken belief concerning a material fact.'" (quoting *Elkind*, 635 F.2d at 163-64)).[2]

### 3.    Puffery

---

[2]In its reply, Motorola argues for the first time that if entanglement does apply, then Plaintiffs have not shown the required proof.  "Plaintiffs' brief is devoid of any of the required specifics about who supplied information to the third parties, how it was supplied, or any interactions between defendant and the third parties."  Motorola's Rep. Br. All Claims at 11. First, at the summary judgment stage, it is Motorola, not Plaintiffs, that bear the burden of showing there is no genuine issues of material fact; Plaintiffs, in their response, were not required to provide evidence as to how they would prevail on the entanglement test, only that the entanglement test was the proper law to follow instead of Motorola's proposed control test.

Second, in its reply brief, Motorola is actually arguing for the first time that Plaintiffs have failed to plead the fraud with particularity.  Thus, the Court will not consider it.  *See Medina v. Dist. of Columbia*, 517 F. Supp. 2d 272, 294 n.18 (D.D.C. 2007) ("Since the defendant raised this argument for the first time in reply, the Court will not consider it.").

Third, Motorola moved for dismissal back on July 16, 2002.  In its August 31, 2004, the Court held, "Contrary to the arguments in defendants' motion to dismiss, the complaint identifies by date, place, and speaker several specific statements alleged to be false or misleading, and thus satisfies the first requirement of the PSLRA and the first three prongs of the Rule 9(b) test."  Slip op. at 8.  The Court also held that the circumstantial evidence gave rise to a strong inference of scienter, satisfying the fourth prong of Rule 9(b).  *See id.*  Throughout the Order, it is clear that defendants had raised the question of whether the complaint was pled with particularity, which the Court appropriately ruled on.

Finally, many alleged third-party statements directly quote Iridium or Motorola officers. To that extent, many of particularities cited by Motorola are directly addressed or easily inferred.

Motorola contends that its and Iridium's statements are inactionable puffery.  "[I]t is well-established under the 'puffery' doctrine that 'generalized statements of optimism that are not capable of objective verification' are not actionable 'because reasonable investors do not rely on them in making investment decisions.'"  *XM Satellite*, 479 F. Supp. 2d at 176 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).  "Combining puffery with accurate historical statements does not render the puffery material."  *Id.* (quoting *Fidel v. AK Steel Holding Corp.*, No. 00-320, 2002 WL 31545952, at *4 (S.D. Ohio Sept. 19, 2002)).  "Under the doctrine established by *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1091 (1991), statements of opinion, if they are material, may be actionable if they are not actually believed when made, if there is no reasonable basis for them, or if the speaker is aware of undisclosed facts that tend seriously to undermine the statements' accuracy."  *Id.*  In the context of securities law, "[a] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock."  In re *Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002) (quoting *Grossman*, 120 F.3d at 1119).  "[W]hether information is material also depends on other information already available to the market; unless the statement 'significantly altered the total mix of information' available, it will not be considered material."  *Id.*

Here, Motorola argues that many of its statements are optimistic, and thus immaterial.  *See* In re *Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) ("Such [vague and general statements of optimism], even if arguably misleading, do not give rise to federal securities claim because they are not material: there is no 'substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"). Motorola groups its statements into two categories: (1) those about the quality and capabilities of Iridium's system and service; and (2) those about the "demand" for Iridium's service and the company's funding. Motorola admits that its and Iridium's statements included phrases such as "excellent" voice quality, "high level of quality," "commercial acceptable levels," providing communications from "virtually anywhere on the face of the planet," and allowing people to communicate "with anyone, anytime, virtually anywhere on Earth from space." *See* Motorola's Mem. in Supp. of All Claims at 24. Further, Motorola admits its and Iridium's statements included phrases such as being "confident of meeting the deadline," being "ready for business," and "fully operational, 24 hours a day, seven days a week." *Id*. at 25. In the second category, Motorola admits its and Iridium's statements included "demand is out there," there is "tremendous demand for the product" and interest in our phones is "so great." *Id*. at 26.

In *Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468 (E.D.N.Y. 2001), the district court, relying on the Second Circuit's decision in *Novak*, explained statements that do more than offer "rosy predictions" can be actionable. *Id*. at 480 ("The court held these statements to be actionable because they 'did more than just offer rosy predications' about the company's future." (citing *Novak*, 216 F.3d at 315)). In making their statements, "Defendants characterized [their] current and future business health in extremely positive terms, 'while they allegedly knew the contrary was true.'" *Id*. at 481 (quoting *Novak*, 216 F.3d at 315). As

27

a result, the *Manavazian* court concluded that "plaintiffs allege that defendants' positive characterization of the Company's current and future business conditions were made while they were aware that an 'adverse business trend' rendered those statements misleading." *Id.* (citing In re *Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999)). Finally, the court held the statements were actionable because "defendants already knew that [their] core business was crumbling when they made misleading statements about the Company's business health."[3] *Id.* at 481-82.

In the present case, there are issues of material fact regarding whether Iridium and Motorola knew their business was not developing properly, whether they were going to meet subscriber and revenue requirements, and whether they knew the Iridium service did not operate as expected (both internally and commercially). Together, these issues could be considered as whether Iridium was aware of an "adverse business trend." There is no doubt that if Plaintiffs' allegations turn out to be true (and they have provided enough evidence that a reasonable jury might agree), Motorola and Iridium's statements were more than mere puffery—Motorola and Iridium either did not actually believe the statements when made, had no reasonable basis for them, or were aware of undisclosed facts that tend seriously to undermine the statements' accuracy.

As to the question of materiality, it is a close call whether a reasonable investor would consider Motorola and Iridium's statements important in determining whether to buy or sell

---

[3]*Manavazian* involved a motion to dismiss, which means the court had to accept plaintiffs' allegations as true.

stock or whether the statements significantly altered the total mix of information available. It is very possible that statements regarding call quality, market demand, and ability to call and receive "virtually anywhere on the planet" might be important to a reasonable investor, especially considering the stated purpose of the Iridium service. Materiality is generally a question of fact for the jury to decide. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) ("The trier of fact usually decides the issue of materiality." (citing *Cooperman v. Individual, Inc.*, 171 F.3d 43, 48-49 (1st Cir. 1999))); *Marsh Group v. Graff*, 46 Fed. App'x 140, 144-45 (4th Cir. 2002) ("The materiality standard for an alleged misrepresentation under § 10(b) 'is an objective one,' and the issue generally presents a question of fact involving 'the significance of the omitted or misrepresented fact to a reasonable investor.'" (citing *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 356 (4th Cir. 1996))). Based on the record before the Court, it cannot be said that the lack of importance of the statements or omissions is so plain that reasonable minds cannot differ. *See Oxford Asset*, 297 F.3d at 1189 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-64 (2d Cir. 2000)). Therefore, summary judgment cannot be granted to Motorola on this issue.

### 4.    *Truth-on-the-Market Doctrine.*

Additionally, Motorola asserts the "truth on the market" doctrine, which is a corollary to Plaintiffs' "fraud on the market" claim. "Under this corollary, a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino*, 228 F.3d at 167. The Second Circuit explains that "[a] defendant may rebut the presumption that its misrepresentations have affected the market

price of its stock by showing that the truth of the matter was already known." *Id*. "However, the corrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Id.* (quoting In re *Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). "The defendants bear a heavy burden of proof. Summary judgment is proper only if they show that 'no rational jury could find' that the market was misled." *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996). Thus, "[i]f 'the evidence presents a sufficient disagreement to require submission to the jury,' summary judgment should be denied." *Id*. (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1376 (9th Cir. 1994)).

Motorola alleges that even if its statements were misleading, corrective information was already on the market or entered the market after the alleged misstatement or omission, and that those who traded after the corrective statements have no direct or indirect connection with the fraud. *See, e.g.,* In re *Biogen Sec. Litig.*, 179 F.R.D. 25, 36-37 (D. Mass. 1997). In its briefing, Motorola cities to several instances in the record that shows there was some information on the market: there were reports that beta testing would be cut short; that the launch would be a "soft roll out"; that there might be delays and glitches; that sound "[q]uality is good but not exceptional" and that there were some issues with sound quality; that there were issues of availability in "urban high rise buildings"; that the system lacked the capacity "to provide service to a very large number of customers in concentrated areas using the system simultaneously"; that handsets were plagued by software development constraints and bugs; that Motorola produced only 10,000 phones in November of 1998 and that Kyocera

delayed shipping its phones; that as of the end of 1998 Iridium only had 3,000 active customers; that Iridium would not begin accumulating meaningful revenue-generating subscribers until first quarter of 1999; and that by March 1, 1999, Iridium announced it would likely fall short of the first quarter Bank Covenants and expected to work with the banks to modify the covenants.

Despite these citations to the record, the Court does not believe, in the end, Motorola has met its "onerous burden."  Whether the purported corrective information was conveyed to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading information created by the alleged misstatements is a fact-intensive inquiry. *See Biogen*, 179 F.R.D. at 37; *cf. Virginia Bankshares*, 501 U.S. at 1097 ("But not every mixture with the true will neutralize the deceptive.").  Given the evidence cited by Plaintiffs, as well as the common sense observation that, despite all the information cited by Motorola, the market was terribly wrong about Iridium's prospects, the Court cannot say at the summary judgment stage that no reasonable jury could find that the market was misled.  *See, e.g.*, In re *Columbia Sec. Litig.*, 155 F.R.D. 466, 482 (S.D.N.Y. 1994) (Under [truth on the market defense], we would find defendants' burden of rebutting the presumption of reliance extremely difficult, perhaps impossible, to meet at the summary judgment stage."); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (explaining truth on the market defense is difficult to meet at summary judgment stage); In re *Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 986 (D. Minn. 2004) ("Defendants have not, and probably cannot, meet that burden at this stage of the litigation.  Indeed, it is a notoriously difficult

burden to carry short of trial."); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1309 n.10 (D.N.H. 1996) ("Indeed, some federal courts have even expressed skepticism over whether the defense may be successfully invoked under Rule 56 given that it typically presents questions involving the nature, extent, and ultimate market influence of the disclosed information–an inquiry that would require a jury to weigh a volume of conflicting evidence and contrary inferences."). Due to the fact-intensive nature of the truth-on-the-market defense, especially in this case, its resolution is best left to the jury.

     *5.*    *Loss Causation.*

Loss causation is the proximate causal link between the alleged misconduct (material misrepresentation) and Plaintiffs' economic harm. *See ATSI Comm'cs, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). "[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Garber v. Legg Mason, Inc.*, No. 06-9436, 2008 WL 697638, at *13 (S.D.N.Y. Mar. 17, 2008) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* (quoting *Lentell*, 396 F.3d at 174). Plaintiffs will not be able to establish the chain of causation if the loss was caused by an intervening event, such as a general fall in price of stocks. *See id.* "But such is a matter of proof at trial . . . ." *Id.*

(quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  Loss causation is an affirmative defense and the risk of nonpersuasion is on Motorola, not Plaintiffs.  *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995) ("The defendant . . . bears the burden of proving that the price of decline was not related to the misrepresentations in the registration statement.").

In its discussion on loss causation, Motorola again tries to inject its truth on the market defense, which the Court has decided is a jury question.  In fact, most of Motorola's loss causation argument rests on establishing that the disclosures revealed information already known to the market, and thus could not have negatively affected the market.  The Court holds that this remains a factual determination to be decided by the jury, and that, as a result, Motorola cannot prevail on summary judgment.  *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) (holding that loss causation is fact-intensive inquiry best resolved by trier of fact).  Plaintiffs have provided expert testimony to establish causation, and the evidence in the records is not so clear as to allow the Court as a matter of law to find otherwise.[4]  *See Apple Computer*, 886 F.2d at 1116 ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.").  Because a reasonable jury might find that Motorola cannot prevail on its truth on the market defense, it could also find that Plaintiffs' losses were caused by the relevant misrepresentations.

---

[4]Motorola has also challenged Plaintiff's expert, Anthony Saunders.  For reasons stated *infra*, the Court denies Motorola's motion to exclude.  As a result, Motorola's request for summary judgment on Plaintiffs' Counts IV and V is denied.

Motorola also argues that summary judgment should be granted against class members who purchased shares before December 23, 1998, because the bank covenants did not exist until then, meaning the first alleged misstatements did not occur until that date. Plaintiffs respond that their claim is based on Iridium and Motorola's "previously rosy statements." Thus, according to Plaintiffs, it does not matter that the loan covenants did not exist until December 23, 1998, because Iridium and Motorola's "misleadingly positive financial and operational statements clearly did." "[A] complaint's inclusion of statements made before the class period does not require dismissal when they are 'relevant in determining whether defendants had a duty to make a correct disclosure during the Class Period." *Lapin*, 506 F. Supp. 2d at 237 (citing In re *Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 290-91 (S.D.N.Y. 1999)).

For much the same reasons stated in *Lapin*, the Court finds that Iridium and Motorola's statements made before December 23, 1998, are relevant in determining whether defendants had a duty to disclose after that date. Much of this case centers on the strength of Iridium, and Plaintiffs have properly alleged that insiders knew even before commercial launch that the company was shaky. Information about the loan covenants, while important, is not the only information involved here; the greater issue is whether Iridium and Motorola were covering up the poor performance and future prospects of Iridium. The Court, therefore, denies Motorola's request to grant summary judgment against class members who purchased shares prior to December 23, 1998.

      6.     *Iridium Bonds*.

Finally, Motorola contends that "courts have recognized that bond damages are not susceptible to class recovery."   Unfortunately, Motorola provides no support for this argument.   Plaintiffs respond that the bondholder class members should be allowed to adjudicate the liability elements on a class-wide basis, while the damages for individual bondholders "as to which plaintiffs do not offer a class-wide estimate, can be established based on the individual purchases and sales of the bondholders, available in a claims process following adjudication of liability."

Plaintiffs only cite one case in support, In re *Nassau County Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006), but that case was focused on the issue of whether a court could certify a class under Rule 23(c)(4) as to liability "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *Id*. at 227.   However, damages are an element of a securities fraud claim which Plaintiffs must prove, and that can be done only by expert testimony. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("[P]roof of damages in a securities fraud case is always difficult and requires expert testimony . . . ."); *see also* In re *Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744 (S.D.N.Y. 1985) ("Undoubtedly, expert testimony would be needed to fix not only the amount, but existence, of actual damages.").   Plaintiffs maintain that individual bondholder damages for the class representatives can be established by lay evidence, yet they cite no support for this proposition.   Thus, the Court grants summary judgment to Motorola as to the individual bondholders.

**D.    Motorola and Plaintiffs' Cross-Motions for Summary Judgment on**

## Motorola's Control-Person Liability

Plaintiffs allege that Motorola is liable as a control person for Iridium's actions under Section 15 of the 1933 Act and Section 20(a) of the Exchange Act.  Motorola moves for summary judgment on both the Section 15 and the Section 20(a) claims; Plaintiff Richard Mandelbaum moves for summary judgment on only the Section 15 claim.  Establishing control person liability requires Plaintiffs to show, as part of their prima facie case, both an underlying violation of the securities laws by the controlled person (Iridium), and Motorola's control over the controlled person.  *See* In re *Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 23 (D.D.C. 2000).  The Court has already determined that there are genuine issues of material fact regarding the underlying violation of securities law.  As to the Section 20(a) claim, Plaintiffs must allege that Motorola was in some meaningful sense a culpable participant in the primary violation.  *See Ganino*, 228 F.3d at 170 (holding plaintiff must "show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person"); In re *Monster Worldwide, Inc. Sec. Litig.*, No. 07-2237, 2008 WL 623339, at *3 (S.D.N.Y. Mar. 4, 2008); *see also* In re *Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 & n.43 (S.D.N.Y. 2007) ("Unlike § 15, § 20(a) requires that the plaintiff must also 'allege culpable participation "in some meaningful sense" by the controlling person in the fraud.'").  Culpable participation is not an element of § 15.  *See Refco*, 503 F. Supp. 2d at 660 & n.43; *see also Garber v. Legg Mason, Inc.*, No. 06-9436, 2008 WL 697638, at *16 (S.D.N.Y. Mar. 17, 2008) ("Additionally, Section 20(a) claims must allege 'culpable participation.'").

36

      1.     *Culpable Participation under § 20(a).*

The term "culpable participation" is not easily defined. *See* Daniel P. Waxman & Eva L. Jerome, *'Culpable Participation'–How's that Again?*, N.Y.L.J., Dec. 6, 2004, at S6 ("Although the Second Circuit has referred to culpable participation in five of the six §29(a) cases it has reviewed since Lanza, it has never defined the requirement."). Several district courts have held, however, that "culpable participation" is met where the defendants knew or should have known that the controlled person was engaged in fraud. *See* In re *Comverse Tech., Inc. Sec. Litig.*, No. 06-1825, 2008 WL 495547, at *8 (E.D.N.Y. Feb. 20, 2008); *see also Refco*, 503 F. Supp. 2d at 660-61 (under culpable participation element, "the plaintiff 'must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct'" (quoting In re *Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 627 & n.53 (S.D.N.Y. 2005))). This means that "a section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." *Lapin*, 506 F. Supp. 2d at 246.

Motorola relies primarily on two cases for the proposition that under the "culpable participation" element, Plaintiffs must show that Motorola had some degree of actual control over the contents of the statement: *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355 (E.D.N.Y. 2000), and In re *ICN/Viratek Sec. Litig.*, No. 87-4296, 1996 WL 164732 (S.D.N.Y. Apr. 9, 1996). Neither case supports this theory. In *Winkler*, the court noted that "[w]hether plaintiff could have established 'controlling person' liability against [defendant] is not at issue at this

point, since plaintiff did not pursue it at trial by requesting a charge to the jury or otherwise pursuing such a theory." 198 F.R.D. at 365. Second, to the extent the *Winkler* court went on to discuss whether defendant was a controlling entity, its analysis focused on the second element (defendant's ability to control the primary violator), not the culpable participation element. *See id.* ("On the contrary, the fact that the drilling qualification discussed between Becker-Fluegel and Bronson suggests that neither had any degree of control over the contents of the press release."). Similarly, the *ICN/Viratek* court's holding goes to the second element of control, not the culpable participation element. *See* 1996 WL 164732, at *14.

In any event, Plaintiffs and Motorola disagree over who has the burden of establishing culpable participation. "[D]istrict courts within the Second Circuit have divided over whether section 20(a) requires an allegation of 'culpable participation' as an element of a section 20(a) violation, or whether section 20(a) created a burden-shifting framework where plaintiffs must only plead a primary section 10(b) violation and control, with defendants allowed to raise a good faith defense in their answer that can later be rebutted by plaintiffs." *Lapin*, 506 F. Supp. 2d at 245. District courts in New York have noted the confusion created by two Second Circuit cases, *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996), and *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), regarding who ultimately bears the burden of proving culpability. *See* In re *Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 415-16 (S.D.N.Y. 2001). The *Livent* court explained:

> Judge Sweet has observed that "[d]espite the circuit court's apparent holding in *First Jersey* that both controlling person status and a person's culpable participation are part of the *prima facie* case, the court went on to state that

> 'there can be no question that [the defendant] was a controlling person . . . .
> Hence, in order to escape controlling-person liability, [he] had the burden [to
> establish good faith.'" *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 766 n.4
> (S.D.N.Y. 2001) (quoting *First Jersey*, 101 F.3d at 1473). This shift in the
> burden of proof "seem[s] to elide the culpable participation element" of the
> *prima facie* case. *Id.* at 764. If "good faith and lack of participation are
> affirmative defense, . . . requiring them as part of the plaintiff's *prima facie*
> case . . . confuses the parties' responsibilities." *G.A. Thompson & Co. v.
> Partridge*, 636 F.2d 945, 959 (5th Cir. 1981); *accord Metge v. Baehler*, 577 F.
> Supp. 810, 816 (S.D. Iowa 1984) ("culpability and good faith are two sides of
> the same issue"), *aff'd in pertinent part*, 762 F.2d 621 (8th Cir. 1985). In other
> words, requiring the plaintiff to plead culpability, at the same time requiring
> the defendant to prove good faith at trial, engenders an awkward allocation of
> pleading and proof whereby both parties bear burdens on the same issue.

*Id.* The court noted that it could not ignore *First Jersey*, concluding: "Nothing precludes

such a burden-shifting scheme, and however unusual it may be to require the plaintiff to plead

an element that, at trial, the defendant bears the burden to disprove, reading *First Jersey* this

way reconciles the apparent inconsistency." *Id.* at 416.[5]

Obviously this Court is not bound by Second Circuit precedent; however, the D.C.

Circuit has not directly ruled on the issue and this Court has relied heavily on Second Circuit

(including district court) cases precisely because of their familiarity and extensive experience

with securities litigation. As a result, the Court believes *Livent* provides the correct analysis.

The Court already held in its August 31, 2004, Order that Plaintiffs' properly pled their prima

facie case for control. *See* slip op. at 15-17. Motorola bears the burden of proving good faith

---

[5]The Court notes Motorola cites *Livent* in support of its argument that Plaintiffs must
plead, and therefore prove, culpable participation. *See* Motorola's Reply on Claims Against
Motorola, at 9. As the quoted paragraph above explains, while the *Livent* court agreed plaintiffs
must plead culpable participation, it also recognized that defendants have the burden of
disproving culpable participation (or proving good faith) at proof stage.

(or disproving culpability) at trial. *See Livent*, 151 F. Supp. 2d at 416; *see also* 15 U.S.C. § 78t ("Every person who, directly or indirectly, controls any person [who committed securities fraud] shall also be liable jointly and severally with [the controlled person], unless the controlling person acted in *good faith* and did not directly or indirectly induce [the violations]." (emphasis added)).

Moreover, in the present case, Plaintiffs have cited enough evidence in the record to infer that Motorola knew or should have known Iridium was engaging in fraudulent conduct. In the Court's August 31, 2004, Order, the Court explained that "Plaintiffs have alleged that Motorola was intimately involved in the Iridium project–in particular, the underperforming technology–and was therefore in a position to know that the statements in Iridium's SEC filings was misleading." Slip op. at 16. The record now before the Court continues to support this inference. Motorola's brief focuses on its lack of involvement in writing Iridium's SEC filings and press releases; however, that is not the focus of culpable participation. Instead, the question is whether Motorola knew or should have known Iridium was fraudulently portraying itself publicly in a positive light while internally it knew of damaging evidence to the contrary, evidence that reasonable investors would have considered important in determining whether to buy or sell stock. Motorola's contention that it did not "play[] any role at all in drafting, editing, commenting on, or in any way determining the final content of the [SEC] Registration Statement or Prospectuses" might help establish a good faith defense at trial, but, considering the record currently before the court, it does not do so as a matter of law at the summary judgment stage. The same is true for Iridium's press releases and statements to

40

media sources.  There appears to be ample evidence from which it can be inferred that Motorola knew or should have known of Iridium's fraud, but did not take any steps to prevent it.  *See Dietrich v. Bauer*, 126 F. Supp. 2d 759, 768 (S.D.N.Y. 2001) ("If Cohn should have known of the fraud, then he had a duty of due care to take steps to prevent it.").  Thus, Motorola has not shown that no reasonable jury could find Motorola culpably participated in the underlying fraud committed by Iridium.

> ## 2.    *Control Under § 15 and § 20(a).*

Under the second element of Plaintiffs' prima facie case, "[c]ontrol over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  *First Jersey*, 101 F.3d at 1472-73 (citing 17 C.F.R. § 240.12b-2).  "Whether a person is a 'controlling person' is a fact-intensive inquiry . . . ."  *Katz v. Image Innovations Holdings, Inc.*, No. 06-3707, 2008 WL 762105, at *6 (S.D.N.Y. Mar. 24, 2008).

Motorola does not seriously dispute that it had influence over Iridium, only that it did not have the amount of influence necessary to constitute "enforceable" power.  *See* In re *Motel 6 Sec. Litig.*, 161 F. Supp. 2d 227, 238 (S.D.N.Y. 2001) ("Control is not the same as influence; a 'control person' must have some enforceable power over the primary violator." (citing In re *Blech Sec. Litig.*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997))).  This merely states the obvious; under the SEC's definition, the influence must, at the very least, be capable of *causing* the direction of the management and policies of the controlled person.  Enforceable

power does not, as Motorola suggests, mean only the power *to direct* the controlled person; it also includes the power to *cause* the direction. Other district courts have described control more generally to mean "facts from which it can be inferred that the defendant had actual power or *influence* over the controlled person." *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (quoting *Rich v. Maidstone Fin., Inc.,* No. 98-2569, 2002 WL 31867724, at *11 (S.D.N.Y. Dec. 20, 2002)) (emphasis added).

Motorola hinges much of its argument on the fact that it did not control a majority of the Iridium board seats. It admits, though, that it directly designated five of the 28 members of the Iridium LLC board until March 1999, at which point it gained a sixth director (out of 29), the result of terms it negotiated as part of its agreement to be a guarantor of Iridium's bank loan. Motorola also argues that it did not appoint any of the members of the IWCL board, the entity that issued the securities. But, that seven-member board was chosen by Iridium LLC (2 seats); Iridium SudAmerica, Nippon Iridium, and Vebacom Holdings (1 seat each); and independent directors (2 seats).

In support, Motorola cites several cases to support its argument that the ability to appoint a minority of directors does not establish control person liability. First, the Court notes that three[6] of Motorola's cited cases involve motions to dismiss; this Court has already

---

[6]In re *Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005); In re *Global Crossing, Ltd. Sec. Litig.*, No. 02-910, 2005 WL 1881514 (S.D.N.Y. Aug. 5, 2005); In re *Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005). It appears that even Motorola agrees that motion to dismiss cases are unhelpful on this issue at the summary judgment stage, as in its reply it takes issue with Plaintiffs' citation to a motion to dismiss case showing minority ownership can establish control. *See* Motorola's Rep. Br. on Claim Against Motorola at 16.

denied Motorola's motion to dismiss based on control.  Thus, to the extent Motorola is attempting to relitigate issues already decided by the Court, its motion is denied.  Another case cited by Motorola, *Illinois Clean Energy Community Foundation v. Filan*, No. 03-7596, 2004 WL 1093711 (N.D. Ill. Apr. 30, 2004), does not even involve federal securities law. Finally, Motorola's last case, In re *Healthco International, Inc.*, 203 B.R. 515 (Bankr. D. Mass. 1996), not only does not involve either § 15 or § 20(a), its holding that minority shareholder did not control the company is based on Delaware state law, not federal law.  *See id*. at 518 (citing Delaware state cases).  As a result, these cases are less than persuasive.

In addition, Motorola argues that Plaintiffs have failed to establish Motorola controlled Iridium in four other respects: (1) Motorola controlled the board not only through its own directors, but also because it controlled the gateways who also appointed some directors; (2) former Motorola executives were also Iridium officers; (3) Motorola had various contracts with Iridium; (4) Motorola was Iridium's largest shareholder and provided financial support through guarantees and financing.  Motorola has alleged facts which might support its claim that it did not control Iridium.  For example, it argues that it did not have sufficient ownership interest in the gateways, and thus could not control those board seats.  It also argues the directors operated independent, and provides some testimony to this effect.  Moreover, Motorola claims the contract's terms did not give it a right to direct or control Iridium.

To the contrary, though, there remain genuine issues of material fact in the record regarding whether Motorola controlled Iridium.  Plaintiffs have shown that Motorola had the power to appoint and direct a substantial minority of the board of directors—in fact, had the

power to appoint more directors than any other individual entity.  Additionally, Plaintiffs have

produced evidence that Motorola's directors almost always voted as a block, providing them

significant influence, even without a majority.   Iridium's January 25, 1999, Prospectus

admitted that "Motorola could in certain situations exercise significant influence over

Iridium."  Several former Motorola employees were Iridium officers and maintained close,

if not official, contact with Motorola; Iridium itself was originally a Motorola project and

subsequently spun off.  A senior Motorola official once commended one of Motorola's

designees on the Iridium board because he "[a]ctively represented Motorola's interest on the

ILLC board . . . ."  A 1996 letter from an Iridium board member stated:  "Motorola now has

very significant representation on the Board relative to the other investors and already exerts

extraordinary influence over the Company with its existing representation on the Board and

as Iridium's largest contractor."  Motorola owned at least 19% of Iridium's stock.  Motorola's

interest in several gateways, while not a majority, was also a significant minority and

potentially allowed control.  There is also some evidence that Motorola might have organized

the firing of Staiano.  Finally, Motorola, as a guarantor, potentially had great influence,

especially considering the bank covenants and Iridium's financing are a major issue in this

case; in fact, the importance of Motorola's position as guarantor can be inferred from the fact

that as a result Motorola was able to gain an additional director.

Thus, having reviewed the record, the Court concludes that there remain genuine issues

of material fact.  In reaching this decision, the Court considers "the total effect of the various

indicia of control in combination" and finds on the whole–having viewed the evidence in the

light most favorable to Plaintiffs and making all reasonable inferences in favor of Plaintiffs–that Motorola has not shown that no reasonable jury could find Motorola controlled Iridium.  *See* In re *Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996); *see also* In re *Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 263 (S.D.N.Y. 2005) ("A court 'must consider the total effect of the various indicia of control in combination,' rather than examining any one indicia in isolation.").   On the other hand, viewing the evidence in the light most favorable to Motorola and drawing all reasonable inferences in favor of Motorola, Plaintiffs have not established as a matter of law that Motorola controlled Iridium.  Therefore, the Court denies both Motorola's and Plaintiffs' motions for summary judgment on the issue of control.

### 3.      *Motorola's Press Releases.*

Motorola moves for summary judgment on Plaintiffs' claims that it made material misrepresentations in several press releases.  Its motion is based on four arguments: (1) the alleged statements were accurate when made; (2) the statements were puffing; (3) the statements were immaterial given the total mix of information in the market place during the time of the press release; and (4) Plaintiffs cannot prove loss causation.  As discussed above in the section on third-party statements, there remain genuine issues of material facts regarding the statements made by Motorola in its press releases.

Motorola has presented some evidence that it might have believed its statements were true when it made them, especially in regards to the September 8, 1998, press release.  However, Plaintiffs have also presented evidence that Iridium and Motorola knew there were

issues with the system before that time, causing the launch to not only be delayed but testing to be cut short.  "[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e. the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty."  *Lapin*, 506 F. Supp. 2d at 239 (citing In re *Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)).  Many of the positive statements walk a fine line.  In such a fact-intensive situation, it is appropriate to let the fact finder resolve these issues.

Further, the Court declines to grant summary judgment to Motorola on the issues of puffery, total mix of information (truth on the market), and loss causation for the reasons discussed above in the section on Motorola's Motion for Summary Judgment on All Claims.

### E.   Motorola's Motion to Exclude the Damages Testimony of Anthony Saunders

Motorola concurrently filed a motion to exclude the testimony of Anthony Saunders ("Saunders"), Plaintiffs' expert witness.  Plaintiffs have the burden of establishing, by a preponderance of the proof, the admissibility of Saunders's testimony.  *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)).  To be admissible, expert testimony must be both relevant to a material issue and reliable.  *See Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. 04-1161, 2007 WL 4730934, at *1 (D.D.C. May 30, 2007) ("In doing so, the judges must 'ensur[e] that the expert's testimony rests on reliable foundation and is relevant to the

task at hand.'" (quoting *Daubert*, 509 U.S. at 598)).  Under Federal Rule of Evidence 702, if

specialized knowledge will assist the trier of fact to understand the evidence or to determine

a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is

based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of

the case.  Expert testimony may not be permitted where it is based upon speculation.  *See*

*United States v. Rogers*, No. 05-292, 2006 WL 5249745, at *5 (D.D.C. July 17, 2006) (citing

*Daubert*, 509 U.S. at 590).

Plaintiffs offer Saunders's testimony to establish loss causation, specifically the drop

in shareholders' stock value as a result of Iridium's alleged fraud coming to light.  Motorola

complains that Plaintiffs told Saunders to assume their fraud allegations were true, and to

assume the disclosures corrected prior misrepresentations.  It also complains that Saunders

"reviewed very little of the factual record in preparing his analysis."  Finally, Motorola

contends Saunders did not "do a comprehensive review of the other information available to

the market before the event dates to confirm that the information he assumes impacted stock

prices was new, material and unexpected."

Dr. Saunders is Chair of the Department of Finance at the Leonard N. Stern School of

Business at New York University.  Saunders's academic qualifications include 30 years of

research experience studying "financial economics, financial institutions and international

finance and banking."  He also serves annually on the nominating committee for the Nobel

Prize in Economics.  As part of his expert testimony, Saunders conducted an event study analyzing abnormal returns on the price of a security.  He then analyzed other indicators of efficient markets, reaching the conclusion that the market for Iridium stock was semi-strong form efficient.  Plaintiffs argue that Saunders's findings about market efficiency were necessary to establish loss causation and identify statistically significant abnormal returns. Saunders's findings include statistically significant events relating to stock price changes affected by news articles.  Saunders also calculated artificial inflation during the class period, concluding that Iridium stock was artificially inflated by at least $11.72 per share at the outset of the Class Period.

Having reviewed both parties' briefs, it is clear that most of Motorola's complaints go to the factual basis of Saunders's opinions.  "[I]t is not proper for the Court to exclude expert testimony 'merely because the factual bases for an expert's opinion are weak.'" *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 7 (D.D.C. 1996) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993)).  As a result, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," making it a jury determination.  *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 450 (8th Cir. 2008).  Further, "[a] district court has discretion under Federal Rule of Evidence 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony."  *Boyar*, 954 F. Supp. at 7.  Motorola may cross-examine Saunders about the factual basis of his opinions, but its disagreements with that factual basis does not affect the testimony's admissibility.  The Court also holds, in its discretion, that any assumptions

Saunders made were reasonable considering the specific facts of this case.  It is not Saunders's responsibility to prove Iridium and Motorola committed fraud; Saunders is only proposing to illustrate how disclosures correcting that fraud affected the stock price.

Additionally, Motorola asserts that Saunders improperly assumed that statements on four disclosure dates corrected earlier misstatements.  This, however, demonstrates that Motorola's argument is misplaced: whether those disclosures corrected earlier misstatements by Iridium and Motorola is an issue of fact for the jury to decide.  Should the jury determine that the disclosures did not correct earlier misstatements (either by deciding there were no misstatements or by agreeing with Motorola's truth on the market defense), Saunders's testimony regarding loss causation and damages will be unnecessary.  Should the jury determine, though, that the disclosures did correct earlier fraudulent misstatements, then it obviously does not matter that Saunders assumed those facts

Finally, a great deal of Motorola's motion to exclude argues that Saunders did not consider the other information already known to the market.  Again, this is a factual basis that goes to weight, not admissibility.  Further, this is simply another attempt by Motorola to argue its truth on the market defense.  However, as already explained above, that is a legal affirmative defense which Motorola has the burden of proving at trial; Plaintiffs and their expert have no duty to disprove the truth on the market defense.

Therefore, the Court holds that Saunders's testimony is admissible and will assist the trier of fact in determining loss causation and damages.  "The Court's role is not to determine whether [the expert's] testimony is correct, but rather whether it falls 'outside the range where

experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is "shaky."'" *Concord Camera Corp. v. Fuji Photo Film Co.*, No. , 2000 WL 1013958, at *12 (S.D.N.Y. July 24, 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).  Based on the record, the Court cannot say that Saunders's testimony falls outside that range.  Thus, it is up to the jury to weigh the evidence and determine the conflicting views.  Motorola's motion to exclude is denied.

## III.    Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff's Renewed Motion for Partial Summary Judgment under the Doctrine of Collateral Estoppel [Doc. # 203] is DENIED; it is further

ORDERED that Motorola's Motion for Summary Judgment on All Claims [Doc. # 204] is GRANTED, in part, and DENIED, in part.  It is further

ORDERED that Motorola's Motion for Summary Judgment on Claims Directed Against Motorola [Doc. # 205] is DENIED.  It is further

ORDERED that Plaintiff Richard Mandelbaum's Motion for Partial Summary Judgment on Section 15 Claim [Doc. # 207] is DENIED.  It is further

ORDERED that Motorola's Motion to Exclude the Damages Testimony of Anthony Saunders [Doc. # 206] is DENIED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  <u>April 3, 2008</u>
Jefferson City, Missouri